May it please the court. My name is Roman Rector and I represent the petitioner or appellant in this matter, Jason Dale Jack. I would like to reserve three minutes for rebuttal. A competent, diligent, reasonable defense requires more. A reasonable attorney would have more thoroughly investigated the case. A murder one case requires more. The district court erred and was unreasonable when it ruled that petitioner's counsel was not ineffective when he failed to investigate and present witnesses and evidence at trial and that the cumulative effect of those errors did not meet the standards outlined in Strickland. The district court erred and was unreasonable when it ruled that the newly discovered evidence failed to demonstrate petitioner's The district court erred and was unreasonable when it ruled that petitioner's claim that the refusal of the trial court to issue the jury instruction, Calgic 2.71.7, did not violate petitioner's due process rights under the Fifth and Fourteenth Amendments. Your Honor, Your Honors, I argue to you today that Robert Blaser, petitioner's trial counsel, was ineffective when he went to trial. Is the Strickland standard itself directly applicable here? I believe that it is. If we were reviewing a direct appeal? Well, obviously, it would be the habeas standard and the ADPA standard under, you know, 28 U.S.C. 2254 D.1 and 2, or D.1 and 2. But you have to say that the State court unreasonably was an unreasonable application of Strickland. Absolutely. Not what we would say violated. Absolutely, Your Honor, yes, yeah. The unreasonable application standard of 2254 D.1. Your Honor, there's been a lot of appeals and writs filed, and there's a lot of evidence in this case, and I think one of the things that needs to be focused on here is that Mr. Blaser, who is a highly competent attorney and was part of the dream team on the case, was just simply too busy to prepare for this case. The O.J. case ended on October 3, 1995. That was the day the verdict came down. The this trial, Petitioner's trial, was set for trial on December 4, 1995, about two months previous to the O.J. case ending. Mr. Blaser was retained on 1010 of 94 some 13 months prior. He simply did not have the time to investigate. He was embroiled in this litigation with the O.J. case. It was a very high-profile case and a case that was going to really make his career. There are a few other cases that he was involved in, but I think he was just too busy to prepare for this case. I know he had an investigator, I guess his wife, did some investigation. I think it was his wife, Mr. Sumrall, I don't know. Yes, Your Honor. He interviewed several witnesses before the trial. Yes, Your Honor. There were two investigators. One was a lady by the name of Carol, who was supposed to be doing the job while he was down in L.A. litigating or trying the O.J. case. Carol was not doing a very good job, so he fired her and hired his wife, Charlotte, to do the rest of the investigation. And there's an internal memo, and it is page 253 of the excerpt of Reppert, dated November 6, 1995, about 29 days prior to trial. It states, and I quote, We start trial in four weeks on this case, and there is much work to do. This case has to be a first priority case from now until trial. This is about 30 days prior to the trial beginning. What the question is But this is all something that can be presented to the State Court, that was there, it's in the record. I We have to decide whether the State court's evaluation of this, which was closer to the time, was unreasonable. Yes, Your Honor. I just don't see how – I'm not understanding your argument as to that point. Okay. Here's the reason that it was unreasonable, and this is what my argument is going to focus on, Your Honors. There was four people in the car that day. There was the four young men driving around. There was the Petitioner, my client, Jason Jack. There was the shooter, Isaac Reddy. And then there was Jesse Dominguez and Ricardo Castillo. Now, Ricardo Castillo had been with Mr. Jack the entire day. He went to the party with him. He witnessed the shooting. And what occurred is, is that Charlene, the main State's witness, the one who testified about these conversations in the car, in other words, Charlene is the one who showed and gave the jury the evidence regarding his intent and motive. She's the one who testified between my client and the shooter saying that something's going to go down. We're going to shoot those rival gang members. We're going to do X. We're going to do Y. We're going to do these bad things to them. She later recants her testimony, and that's a different issue. But what Ricardo, in his declaration, says is he says these conversations never took place. These conversations didn't take place. And it is an unreasonable application of Strickland because any trial attorney who had this knowledge, who had this knowledge that Ricardo can directly rebut the statements of Charlene would have put him on the stand because he didn't seem to have anything else. There were three witnesses presented at trial on the defense side. One of them was Charlene to try to impeach her. The State's main witness was Charlene. So they tried to impeach her and put her on the stand. That didn't go so well. Then he puts on Chris Tarrin, who's the second defense witness, who is a gang member. He's a known gang member, and that's to rebut a conversation that Angel Velez heard. And then the third State witness was Sakai Nicholas, who was the petitioner's mother. So one could argue, well, it was a defense strategy. It was strategy to not really present a defense. We're going to take the State to task, and we want the State to prove up their case. But that's obviously not the case because he puts on this Chris Tarrin a known gang member. Charlene gets on the stand. You have affidavits of what these people would have said if the investigation had been made, and you've got that all in the record? Yes, Your Honor. And what is – I've looked at your brief, and I just don't see much authority cited. What is the authority you're relying on under the standard that we must apply under the standard that most supports your position in this case that this was an unreasonable application of Strickland? It's the Strickland standard, just that there was a – that the attorney – I'm trying – I'm asking you if there's a habeas case that you have applying the unreasonableness – unreasonable application that you can cite to us to help. The brief cites a number of cases that goes through, and I did not write the brief. I was – that attorney had some problems and had to give up the practice of law, and I took over this case from him. So I did not write this brief.  Was the – were the affidavits presented to the California court, any California court? Yes, Your Honor, to the California Supreme Court. And there's four affidavits. And one is from this, Richard. Two of the affidavits that were presented to the California Supreme Court and to the Two of the declarations are from people who were in the car with the Petitioner that day and who were there and present for the shooting, Ricardo Castillo and Jesse Dominguez. Neither one of these two individuals, people who rode in the car with him, were with him all day and were present there at the shooting, they weren't used at trial, and they were never – an investigator never went to speak with them. Did you ask the district court for an evidentiary hearing? The prior attorney did. I substituted in after. Substitute – okay. That's what I'm confused about. Yes, Your Honor. And what was the district court's ruling on that? The district court denied an evidentiary hearing. Saying? Just that they – the district court had oral argument on the issue and had oral argument and decided that an evidentiary hearing would not be needed. And that brings me to the next issue, is that the State's main witness recants. Charlene, the person who shows the motive, the intent, Charlene recants her testimony. In a declaration submitted to Your Honors, she says, and I quote, paragraph – That's not unusual. I understand that it's not unusual, but that was the State's main witness, was this Charlene, and now she's recanting. And the problem here, the reason that she recants, there's really – the standard for Your Honors to decide whether or not this declaration should be given consideration or wait is whether or not you believe it, is whether or not it should be believed, and whether or not it would have made a difference in the minds of the jury. Well, the reason – Charlene didn't show up for the very first day of trial. She was scared and she was being intimidated by these gang members, the decedents. Gang was the Diamond Boys. And the Diamond Boys had essentially said to her in no uncertain terms, if Mr. Jack and Mr. Reddy, the shooter, are not convicted, you're going to have problems. And in fact, she did not show up to her very first day of testimony fearing, one, that she was either going to get hurt or she was going to have to perjure herself. And that's in her later affidavit when she recants, is that right? Yes, Your Honor. Yes. Okay. And she says – she shows up the second day scheduled for her testimony, and she – there are gang members in the courtroom that day. And she said she feels a lot of pressure. I have here her declaration, and starting at paragraph number 5, she says, and I quote, when I testified at the trial, I was afraid for my safety and I did not tell the complete truth. The events of which I was not truthful, I will now correct with the truthful statements. And then she goes on to say that the music in the car was very, very loud, and really people weren't talking because they were playing this very loud music, and that the statements were never even made. In other words, there's this discussion supposedly by her, the state star witness, that there is this discussion going on between the shooter and my client, who was convicted of aiding and abetting, that they say, we're going to get those Diamond Boys. We're going to shoot those guys. I'm down for going to the pen with you, all this kind of gangster talk that, you know, you see in the movies and stuff, that it never occurred, that these – this exchange which showed the intent and motive of my client never occurred. And she completely recants. And I think that her declaration is believable, one, because she never had any prior contact with my client. She didn't know my client. She's not part of the same gang or anything. They're not family relations. There's no relationship between her. So I believe that the declaration is believable because if you look at the fact that she showed up late for trial, that the Diamond Boys were pressuring her to get a conviction, why would she recant now? There's really – my client's in jail. He's not really a member of a gang, so he can't bring any pressure to bear on her. So I believe that her declaration is highly credible because she has no reason to recant. In fact, she came to my client's family feeling bad, saying, I feel horrible for what occurred. I never thought that he would be convicted. I was under a lot of pressure to get a conviction because these guys were threatening me, and I feel really bad about what's occurred. And then the family put her in touch with the Petitioner's Habeas Council. So I believe that her declaration is highly relevant. I believe that it's highly credible because she has no reason to change her story now. She did have a reason to lie then because she was scared about retribution from the, quote, Diamond Boys gang. So — Well, where did the district court go wrong in saying that that isn't enough to – to provide habeas relief because we're not retrying the victim's guilt here? Well, where they went wrong, they said that the – it was not believable is the argument that I was just making. They said – the district court said that, you know, recantations are against public policy, that they – that there's a strong public policy to have finality, which I understand and it makes sense. We need finality in these cases. But where somebody is convicted of murder one two times and is serving double life sentences without the possibility of parole, I think it's too important to just kind of slough her off and say, well, she's not believable. And I think that she is believable because why would she lie now is the argument that I'm trying to make. I think we understand your position. Sure. The third issue involves the Calgic jury instruction 2.71.7. Now, on direct appeal, the third district court of appeal found that it was error for the trial judge to not give this jury instruction. They found that it was harmless error, but they did find error. And again, the district court ruled that it was not – that it was harmless error as well. In fact, they ruled that it was not error. And I believe that this is an unreasonable application because jury instruction 2.71.7 involves statements, oral statements made. And the jury instruction reads as follows, and I'll quote it. It says, "... evidence has been received from which you may find that an oral statement of intent, plan, motive or design was made by the defendant before the offense with which he is charged was committed. It is for you to decide whether the statement was made by the defendant." And then the last and most important line of this jury instruction is, "... evidence of an oral statement ought to be viewed with caution." This statement was read for the – his co-defendant, Mr. Reddy, the shooter. One liked it. But this statement, this jury instruction was not given to the jury regarding my client. And the reason that it's so important, the reason that this jury instruction is so important is because the – the statements, these oral statements, are what convicted him. How is that Federal – a Federal claim? Well, the clearly established precedent that we've cited is Rose v. Clark and the harmless error standard. And the rule in Rose v. Clark that we've cited is the – Rose v. Clark, 386 U.S. 18. It says, "... the reviewing court should not set aside an otherwise valid conviction if the court believes on the record that the constitutional error in question was harmless beyond a reasonable doubt." Now, that applies to the erroneous instruction here. It was an instruction regarding malice. And Rose v. Clark, as you know, involved a guy who had beat his kids, essentially, and killed one of them. And his son – What you quoted refers to constitutional error. Yes, Your Honor. And I – what I wonder is whether this is constitutional error. It's a failure to give some instruction that the State law permits or even requires – that doesn't necessarily mean the Constitution or the Federal law requires. Every – that every State has is a matter of constitutional law to provide such an instruction. Yeah. You know, I understand, Your Honor, and I understand. And I've read the Attorney General's response, and that's – their argument is that this is a State issue, not, you know, a Federal issue. What's your response to it? That's the question. A Federal issue. I believe that it goes to due process. You know, due process under the Fifth and Fourth. So every State – this has to be available under every State's law? Well, I think that it – I think that it's available for review by this Court. Under the habeas standard, I think that it is available for review. Okay. Your Honor, I'll stop there, and I'll reserve the rest of my time for it. Thank you. Good morning. May it please the Court. Sean McCoy, Deputy Attorney General for Respondent. You've been given about as much time as we give the Exxon Valdez, so I don't think that you need to feel obligated to use it. Thank you. With respect to the ineffective assistance of counsel claim and the failure to investigate, Petitioner operates under a misapprehension. Trial counsel did investigate. That's very clear from the memo trial counsel submitted showing that there was investigation of several of the witnesses, including Kelly McCullough, and the note that she was actually harmful to Petitioner's case. Were there interviews of the passengers of the car? There were not interviews of the passengers of the car by the defense investigator. Richard – Ricardo Castillo gave an interview to the police. Ricardo Castillo was also under the influence of marijuana and alcohol at the time. Ricardo Castillo's declaration is somewhat contradictory in that he testifies – he states that the music was very loud and couldn't hear. There's a conflict also with McCullough's statement to the defense investigator where she says this conversation did occur. The Castillo statement is also contrary to other witnesses who placed the defendant at the car at the time of the shooting, as well as Petitioner's own declaration, which places him at the car at the time of the shooting. That's interesting to note. Petitioner places himself at the car at the time of the shooting. Petitioner nor his declarants offer any explanation for why he assisted the co-defendant in going to the house to get the gun. In fact, he admits that they did go there to get the gun. It's kind of hard to say that there's ineffective assistance in investigating when you're conceding the material facts that form the basis of the aiding and abetting. With respect to Calgic 2.71.7, the issue here, even if this rises to a Federal question, is whether the State court's decision was unreasonable and the State court's decision that the error was harmless was based on the additional Calgic instructions that were given, 2.71, involving admissions, and certainly statements involving motive are a subset of admissions. The prior inconsistent statements instruction, Calgic 2.13, 2.20, witness credibility, 2.21.2, whether a witness is willfully false, 2.22, weighing conflicting testimony, and 2.27, the sufficiency of the testimony of one witness. Additionally, there was Calgic 8.80.1, which told the jury that they could not find Petitioner guilty unless they found that he aided and abetted with the specific intent to kill. If there are no further questions, I will submit. Thank you. Thank you. May it please the Court. Your Honors, the main thing here, the main thrust of this case is that you have somebody who was in the car, Richard Castillo, who was there present all day, really two people. These two young men, Richard and Jesse, were never talked to by the defense counsel. And you have a client who is facing double homicide charges, murder in the first degree, is facing life without the possibility of parole. And you don't interview two people who are in the car with you who were there all day? And if you would have interviewed them, he would have known what testimony they could give at trial. And Richard, in his declaration, says, I was never interviewed. And if called to testify, I would have testified to the following. One, there was no conversations. As Charlene testified at trial, there was no conversations between the shooter and Petitioner. These conversations didn't occur. The music was very loud. You couldn't speak. That, two, the Petitioner was not a gang member. That, three, he never held or handled the gun. And you have all this testimony from Charlene saying that Petitioner did X, Y, Z, A, B, and C. And you have no one to rebut it. Nobody rebuts this testimony. Had counsel done his investigation, he would have known that he had a witness who was there, present, and who could absolutely, positively rebut the state's star witness. And but for his failings, I believe that there would have been a different result at the trial. Thank you, Your Honor. Thank you, counsel. The case just argued is submitted for decision. We'll hear the next case, which is United.
judges: Schroeder, Canby, Cjj: Duffy